On behalf of the people, Mr. Richard Mullen. Mr. Wysocki. Thank you, Justice. Justices, good morning. Good morning, Judge. Justices, this is an appeal of the denial of the post-conviction petition, allegedly discovered evidence that speaks to the actual innocence of Paul Newkirk. Paul Newkirk is a now middle-aged man serving a 42-year sentence in the Illinois Department of Corrections for aggravated criminal sexual assault and aggravated criminal sexual abuse. The defendant is entitled to a new trial. Judge Leavitt, the hearing judge, committed error when he made the determination that the petition should be denied. We called, as witnesses and the record reflects, we called the then-alleged victims. At the time of their trial testimony, they were 10 and 11 years old. What's the standard on review relative to this issue? The standard on review relative to this issue is manifest error. Manifest error is that which is clearly evident, plain, and indisputable for review in court. Wasn't this an issue relative to the credibility of the witnesses that testified as juveniles or as minors and now are testifying as adults? It is. It is. And if we give deference to the trial court's findings of fact relative to credibility, which I believe the record reflects that we did, we're really talking about manifest weight of the evidence, are we not? We are. Okay. I have a question, too. Was Judge Rossetti not available because she had gone to a new assignment to hear this? Because didn't she do the trial in this case? Judge Rossetti was a trial judge. She was the chief judge at the time of the proceedings. So if on post-conviction it usually customarily goes back to the judge that tried it, if they are available or on the bench, they have a knowledge of the record. One of the issues that you've raised here is that Judge Leavitt went back somehow to the record and looked at things and you felt that that was inappropriate. Why would that be inappropriate? Well, Judge Leavitt is confined to the hearing judge is confined to the evidence presented at the hearing if he is not the trial judge of record. What Judge Leavitt did was went beyond what occurred at the record. Obviously, he has to look at the record to find out that the defendant was convicted, what his sentence was, and things of that nature. But what Judge Leavitt did is he went beyond the record. He, in his determinations and his pronounced ruling, I think it was on November 1st of the year of 2011, he equated, while he didn't specifically say so, he said that this was tried and tested at the trial court, that the evidence at the 11510 hearings were, he equated admissibility, which is the reliability standard under Section 11510 for hearsay, with credibility. Judge Leavitt either misspoke or he misunderstood, and I believe that he misapplied the fact that Judge Rossetti says, okay, Rashan and Jeremiah's testimony can come in because the circumstances are reliable. He equated that with truthfulness. When in his ruling, he pronounced that their testimony at the trial was trustworthy. Further, he relied upon the verdict of the jury. The jury found him guilty. Their testimony was trustworthy. He equated the determination of credibility by the fact finder and the admissibility into credibility as a major consideration of his determination of lack of credibility of Rashan and Jeremiah, which also he failed to consider the corroborating witnesses to rebut the argument of recent fabrication where Dr. Chantry, the state psychologist that interviewed Rashan in 2006 for a psychosocial evaluation, declared to her that he lied. He lied when he testified as a 9 or 10-year-old boy at Paul Newkirk's trial. Wait, doesn't the jury verdict, let me get back to the jury verdict because now you're going away from that, but doesn't the jury verdict create a presumption that the earlier testimony was truthful? The jury verdict of guilt created a presumption that the earlier testimony was truthful? Which is, yes, Justice. Okay, so why can't the trial or the post-conviction judge then look at that finding and make some comments about the earlier testimony? Because that was the only thing that Judge Leavitt relied on, which is why he commit error, which is why his error is manifest. Oh, perfect. I didn't want to interrupt. Go ahead. Which is why his decision was not based on the evidence that he heard at the hearing. It was clear he didn't consider any of the evidence at the hearing. Therefore, it's arbitrary. And his ruling was unreasonable based upon the evidence that he heard. His argument was, or his finding was, that these two witnesses were completely incredible based upon their lack of demeanor and the clear way in which they made their presentation. Justices, when you've read that aspect of their testimony, you can see how it drifts with intense passion and intensity, and emotion just pours off that page. We don't need an audio recording of how these now young men, ages 24 or 25 as adults, testified as compared to when they were 10 and 11 years old. His finding that they were, matter of fact, was on the record. Just by looking at the words that the young men used under intense cross-examination by the State's attorney and direct examination by me and then redirect, indicates that Judge Levin's determination that there was no emotion, no nothing. Lack of emotion is not the basis. He erroneously found that. I don't know how he could have found that. The record doesn't show how he could have found it, but that's not a basis. And he finds them completely incredible. He gave no credence whatsoever to Dr. Chantry, nor to Mark Knauss, which is the boy's adoptive father. Within a couple of years after this trial testimony and sentencing, these boys were taken out of Arden Shores. They were adopted by this man. After being there a year, at the risk of these naive infantile mental analyses that these boys had, they had to drop this burden. They go to their father, Dad, we're going to tell you something, but we're afraid you're going to throw us out of the home. These boys were bounced around ever since Mary Flemings, their mother, died of a heart attack years earlier and Paul took over as caretaker. Now, what we've explained in this, that the boy's testimony at the trial, excuse me, at the hearing, the state did not controvert it. The only thing that the state and their witnesses were able to say was that there was no denials by the boys that Paul Newkirk had never sexually touched them or abused them. They could remember that there was no denials, but their testimony, Hanna's, Moishe's, and State's Attorney Pinzell's, they couldn't remember anything else of the four interviews that these boys had. January 8th, January 30th, February 6th, where the boys were put together and played off one against the other. If anything, when Pinzell testified on cross-examination, I got out of him the fact that he had at least 10 meetings with these boys. Shopping, dinners at his house, playing sports, spending time with them. It corroborates the fact of what the boys testified to during the hearing, that there was multiple, multiple times where their testimony was practiced, practiced and practiced, and the buzzwords were used. They testified to. Now, I know this is not trial level, but I'm arguing from the record, Justices. The State's witnesses even corroborated what the boys said when Pinzell said there were substantial inconsistencies. Then his story flip-flopped. Moishe, who interviewed him at the direction of Pinzell, August 18th of 1995, couldn't even remember that. Pinzell couldn't remember that. When confronted with the police reports, well, if it's in the report, it must be true. And then where Moishe says, you're brought here because you said something different to Pinzell. This corroborates. I'm not trying to establish state action. I'm trying to explain the extraordinary circumstances under the Stidle case, where in Stidle there was no evidence whatsoever other than oral testimony from the Supreme Court. This is Stidle 2, not Stidle 1, which is predominantly cited in the People's Brief, which dealt with the 2014-01 hearing. Where they said recantation testimony is not held in high esteem. In fact, it's held in low esteem in view of the fact of the presumption of the reliability of the finding of fact at the trial. And we understand all that stuff. Supreme Court says give Stidle a hearing. That's a Stage 2, not a Stage 3. I understand that. But the rule of law is that when there are extraordinary circumstances, you can use recanted testimony. The fact that this testimony, we had no access to it, any other independent source, to show that Jeremiah Rashad was lying. Okay? It qualifies it under the Barstett law. I believe that's how you pronounce it, decision. We couldn't have known about it, so it's new. And certainly if the jury had heard this, they would have rendered the verdict differently. And it would have changed the outcome of the case. What are the extraordinary circumstances? The tender age of these kids, 9 to 10 when they're interviewed. They were adopted by Mary. Mary died. Paul takes care of them. They see Paul brutally assaulted, hogtied, bound, bloody, found in human feces, carted away in an ambulance. The police buy him a hamburger. They take him down to the police department where Hannah asked, well, what happened? Well, I saw Paul. He was being humped. Hannah, when I asked him at the PCP hearing, what was the matter with the word humping? Well, that's not something a little boy 9 to 10 should know. But then he shifted. He admitted he shifted the investigation to the boys. Well, can Paul ever touch you? No. Hannah wouldn't say that, but the boys said, okay, the only thing Hannah contradicted of the boys' testimony was that he couldn't remember or that he said they never denied that Paul had touched them. The trial court was aware of all of these extraordinary circumstances. I'm sorry, Justice. The trial court was aware of all of these extraordinary circumstances. They were all presented to the trial court at the post-conviction petition hearing, correct? The trial court was aware of the extraordinary circumstances. The jury found the defendant guilty based solely upon the oral testimony of the two boys. No other corroborating evidence whatsoever, Justice. No, but I'm just saying the trial court knew that. At the post-conviction petition hearing, the trial court, when it was making its ruling, it knew all these things. I will admit to that, yes. Are we to say that without the record contradicting that the trial court considered that? I mean, the trial court didn't maybe talk about it, but the trial court didn't say, I'm not going to consider these circumstances. The trial court made a credibility determination. What did the trial court do? It was made an admissibility determination as to the substance of now hearsay under 11510. The trial court presided over a trial that was prosecuted by the state, wherein the only evidence that was presented was the oral testimony, or revisions of the oral testimony under 11510 through Dr. Torres, Detective Hanna, Detective Loish. That's it. One of the undertones, I think, of the briefs, and not this argument so far, but of the briefs certainly, is that Hanna and Loish knew that your client was gay, and they were after him in some way. They thought that this, you know, certainly if he's doing this at home, there must be something else going on. Well, Loish, didn't Loish testify that when he was at the advocacy center, and I think that's where he saw the boys, that he didn't have any idea other than your client had been a victim, and he was just trying to find out what the boys knew about this? Madam Justice, Detective Hanna, the initial interrogating detective, on January 8th, the morning of, the day of, when the boys were there from morning to night, was investigating about Luker being assaulted. Hanna did not know Paul was gay. The boys said, we saw Paul being humped. Then Hanna transmitted that into an investigation of the boys as potential victims. Loish, when he examined or interviewed the boys on January 30th and February 6th, and then again August 18th, knew and was fully aware that the boys had previously said that Paul was gay. Now, this is not an imputation of prejudice on the part of the people of the state of Illinois. It is a contextual presentation of facts as to what these naive little boys were thinking at the time they were interviewed by Hanna, under the stressful circumstances in which they found their only caretaker being assaulted. Didn't they claim early on that they were told that if they indicated or testified to the crimes, that they would be kept together, they wouldn't be separated, and they could go home? Justice McClaren, that was their testimony as adults at the hearing, as to their interpretation as naive little boys at the time that they were 9 and 10 and then 10 and 11. Was it interpretation or were they agency statements? Well, they testified that, yes, they testified at the hearing that they were told, oh, come on, Paul is gay, you know he must have touched you. How do you know the word humping? That's what they said, and that was the inferential road of a wrongful conviction. I'm not talking about that. I'm talking about, I said, did they not say that they were told these things? Yes. Your response was, they interpreted it to be, and then you went back to told, but then you started talking about being told about things that I didn't ask you about. So, Mike, let's get back on point, which is, did they not indicate, testify, that they were told early on in the investigation that if they cooperated, that they would be kept together and they could go home? Yes. Did not the police officers deny that being ever said? Yes. Thank you. That's all I wanted to know. Any other questions? No. Thank you, Justice. You'll have an opportunity to make rebuttals here. Thank you, sir. Good morning, Your Honors. Counsel. Your Honors, before I proceed, I would. Wait a second, Counsel. You're Mr. London, are you not? Correct. Thank you. You may proceed. Before I proceed, I would like to make an oral motion to supplement the record with an additional case. I will follow it up with a written motion. I have given a courtesy copy. You said with an additional case? Yes. I'm not quite sure if you want to supplement the record or whether you want to cite additional authority. Sorry, I want to cite additional authority. Yeah, of course. Okay. Have you discussed this with Mr. Wysocki? I have. I've given him a courtesy copy. Do you have any objection, Mr. Wysocki? No, Justice. Thank you. The motion will be granted. Your Honors, the issue, basically, is whether the judge's determination that the recanting witnesses were not credible was manifestly erroneous. The people disagree with the defendant's argument relating to how the judge made that credibility determination. It's clear from the record that the reference to the 11510 hearing was a recitation of the history of the case. It was not a determination that because there was a 11510 hearing or because the judge earlier found that the testimony of the witnesses, the now recanting witnesses, was admissible, that the trial judge, the hearing judge, was now basing his finding of credibility. You would agree that would be improper? Yes. Certainly if that was – probably if it was considered at all as evidence, but certainly if it was considered as the only evidence, as the defendant is suggesting. What about Mr. Wysocki's argument that it was error not to have Judge Rossetti consider the merits of the case? I'm not aware that counsel made that argument. Well, I thought he claimed it was error that Judge Leavitt heard the case that should have been heard by Judge Rossetti. I misunderstood, but that's what I thought I heard. I don't think he – I think he was responding to a question of errors and said Judge Rossetti wasn't. I don't think he argued that that was error. Okay. And I, to be honest, don't know why Judge Rossetti didn't. All right. Why – I mean, this language in Judge Leavitt's ruling – and maybe we should use their names because trial court – we've got – they're both trial courts, but they're two different places. Correct. He – Judge Leavitt says the trial court here, not being the same trial court as originally was involved in the trial of the defendant, did conduct a full evidentiary hearing, credibility, and the reliability of the statements made by Rashawn and Jeremiah. He uses the word credibility, but I believe he's talking about Judge Rossetti's previous hearing. And that's really not what she decided on the 115th day. I don't know that necessarily that's a correct interpretation. I mean, again, you could read it different ways. The fact is that his credibility determination in this case was clearly made based on his finding that the demeanor of the witnesses were totally incredible in his view, because contrary to counsel's argument, contrary to the defendant's argument, the demeanor and the words didn't match up. First of all, I used to do it when I taught law school, but the infamous My Cousin Vinnie case, where it was a great illustration for actual real-life purposes of words versus witnessing, where the character in there suggested that when he was confronted with whether or not he shot the sheriff, his response was, if you look at it on paper, I shot the sheriff. I shot – I'm sorry, the clerk. I shot the clerk. I shot the clerk. I shot the clerk. I shot the sheriff with a song. It was. It was. So does the song change meaning if you listen to the song with or without the lyrics? Well, he did shoot the deputy, so, but no, I don't think that necessarily has a change meaning. But the fact is, if you look at the words, I shot the clerk, you believe he shot the clerk. If you look at the movie, he's, I shot the clerk. I shot the clerk. I shot the clerk. Like, what the heck are you talking about? The words here, you don't look at the words. You don't look at the passion of the writing. We don't know if they're rehearsed. To be honest, in this case, I'd say it actually acts the opposite. If they're talking so passionately, I couldn't sleep every night since I was eight or nine or ten. I lived with this guilt. I could every holiday, every day, I went to bed knowing this. If you're testifying to that and saying this poor guy that was my caretaker, that loved me, that cared for me, and you're showing not only compassion, no passion, that's the exact opposite argument. The judge said, wait a second, I can't believe that you're saying these words and you're showing no passion. And it was both witnesses. Does Judge Leavitt actually identify any phrase that troubled him? I mean, he talks about manner of faculty. He talks about emotion. He didn't refer to a specific phrase. He referred to the demeanor, which is exactly what the court is supposed to assess. And was there any specific time when the demeanor so struck him that, according to his ruling, that this is how he felt? Again, he didn't tie it in directly to specific wording. But at the very least, strong implication is when they were testifying as to, again, just as I'm suggesting, that they were so passionate, they were so concerned, they were so guilt-ridden. And he's saying, well, wait a second, you're testifying to that, but I don't see it. I don't feel it. And again, that's exactly why a court of review is not supposed to look at the words on the record. That's why we give the deference to the judge. In the case that I cited, People v. Morgan, I'm sorry, I asked for Leavitt to cite additional authority. Contrary to defendants' argument that you're supposed to look at the four corners of the evidentiary hearing, the Illinois Supreme Court, in a similar, not identical case, but in a case of newly discovered evidence, arguing actual innocence, where, again, very similarly, it was 18 years or 17 or 18 years after the fact, new judge hears an evidentiary hearing. And the Supreme Court said, as a considered defendant's post-conviction claim for a new trial, the circuit court was duly mindful of the law's skepticism-recanted testimony. The court held an evidentiary hearing. It observed Prater's, the witness's, demeanor and assessed his new testimony against the facts and circumstances previously established at trial. The Supreme Court has clearly said that, yes, you not only can, you're supposed to look at their credibility based on the fact that they were found guilty. If we ignore that, all of the case law relating to the inherent unreliability of recantation testimony is basically without the window. In essence, what defendant is saying is, if we have cases that the only evidence is the testimony of an eyewitness, and if they recant, they must be given pretty much a new trial. Why? Because we can't rebut their current testimony. We can claim, which, again, I argue that the testimony was controverted. The police did say, wait a second. All of the affidavits in the testimony related to the fact that we supposedly coerced them, we promised them, we threatened them, we intimidated them. None of that's true. The supposed ten meetings between the then-assistant, Elliot Pincel, and the boys, he stated on the record, as far as I recall, and yes, they all were honest. The people's witnesses said, other than what we've read in our current reports, we don't remember this case from 16 years ago. But they basically said, out of those ten meetings, maybe I shouldn't have, but I met with the boys outside of the context of the case. Why? Because I felt sorry for them. It was around the holiday times, and I had them over to my house. I went to interview them and saw they were lived in, the place that they were placed was despicable. So, yeah, I felt sorry, and myself and my wife had them over. We didn't discuss, we didn't rehearse any of the testimony. That was controverted. Further, I would also disagree with what the witnesses testified to at trial, at the hearing. Their affidavits and the post-conviction petition argued that they were coerced and promised and lied to. Their testimony said, wait a second, none of that took place. No one made us a promise that we could go home or couldn't go home if we said anything about defendant. Jeremiah said, well, wait a second. I knew what was going on. I knew that if I did, they'd let me. Well, did anyone tell you that? No. I knew that. Well, the supposedly scared, intimidated child portrays himself that he was fairly sophisticated. Again, now he's an adult relating back to his memories. But they didn't even testify at the hearing that they were coerced or pressured. It was argued, it was in their affidavits, their testimony at the hearing, in essence, wasn't really consistent. Well, I think Rashaan testifies that he was really scared. I was scared. What is that? Is that some element of intimidation, being scared? Scared of what? He never said he was scared of the police. He said he was scared. It's understandable. I will give counsel a defendant that argument, that the boys probably were nervous. They probably were scared. They had just seen their caretaker beaten. They should have probably been scared. There's no evidence that he was scared and he lied because he was scared. This court could actually take notice of its earlier Rule 23. The evidence was not as iffy as defendant now suggests. It was not, well, defendant touched me. There was pervasive testimony that he had engaged in conduct with the boys over a two- or three-year period. That was all tested at trial. All the inconsistencies that counsel and defense are now raising, those were tested at trial. They were brought to the attention once again at the hearing. Is it alleged that some of these incidents that were testified to at trial occurred during the time that Mary Fleming was still alive and that the boys had said something to her? I'm not clear of the timing of the record. It does not appear that they ever told. The record doesn't state, and again, the Rule 23 doesn't seem to reference the fact that they ever indicated to Mrs. Fleming. But it may very well have overlapped the time that she was still alive. But again, that part of the record wasn't included in this record on appeal, and there was no reference to that in the brief. Are there similar exceptional circumstances here, as the court found in Stidle? Not remotely. It wasn't until the reply brief that counsel raises the concept of extraordinary, or specifically raised the concept without explaining what extraordinary circumstances are. Stidle doesn't really raise what they are. Counsel now says that the age of the victims, the traumatic nature of the aggravated battery of defendant, the intensive interview process, and the lingering fear of being separated. None of those are extraordinary circumstances. Why? Well, the age of the victims. Any time you have young victims that have been sexually assaulted, that would always be extraordinary circumstances under defendant's theory. Any time you have a crime, well, the traumatic nature of their sexual abuse would be extraordinary circumstances. I don't know if it's any less extraordinary if a woman that's 21 is raped, or an adult sees a vivid thing. The intensive interview process, there's no evidence of that. That's argued. Pincel supposedly said, yeah, you know, I had 10 meetings, but there was no evidence established at the hearing that the kids were kept for, you know, 20 hours at a time, that they weren't allowed to sleep, that they weren't allowed to go home until they, you know, said what they said, and the lingering fear of being separated. What would your definition of extraordinary be? Extraordinary, again, I gave the example of DNA in my brief, and in the case cited, Leeford cited additional authority. Another example is people versus boroughs cited in Morgan. In that case, the court found, in a similar circumstance, newly discovered evidence, that because the recanting witness not only recanted, which typically would be an inherently unreliable, but the fact that she implicated herself in essence confessed to committing the very murder that she was now exonerating defendant. That's an extraordinary circumstance. That's saying, despite the normal suspicion we give to recanted evidence, that's the kind of circumstance that we say, wow, that's pretty credible. If you're going to stand up under oath and say, I did it, we tend to think that you're probably more reliable than otherwise. So the extraordinary circumstances are occurring at the time of the recantation rather than at the time of the original events, or can they be considered at both times? Because Burroughs is apparently at the time of the recantation when she comes forward, but that doesn't talk about what was the circumstance at the time of the event of her initial testimony. Please. The only cases that I've found suggest at the time of the recantation. I have not researched, I have not responded to that direct question. My gut instinct would be that, yes, you can look at all of the circumstances, but the fact is these circumstances that defendants suggest are extraordinary here just simply aren't. They're present in almost every case relating to a child. The child's testifying about a crime that occurred when they were young, whether it's something they witnessed or something that occurred to them, they're going to be, again, theoretically somewhat fearful, somewhat surprised. We'd like to think that they don't witness it on a regular basis, that that isn't part and parcel of what goes on in their life. So if that is an extraordinary circumstance, what would separate this case from any other case where a recanting witness comes in years later? Would it be extraordinary for witnesses to claim that they couldn't sleep at night ever since the event or ever since they testified in the time it was found guilty? Would it be extraordinary that they're claiming that? No, would it be extraordinary that they actually could not sleep at night if, in fact, they were giving false testimony? That could be a factor to be considered in credibility for possible. Again, the witnesses claimed it. There was no proof or demonstration. Would it be extraordinary if they, in fact, believed that, that they didn't come out and recant earlier? Or would that be ordinary? I'm sorry, can you? If, in fact, they couldn't sleep at night for 15 years or whatever it was and they decided to recant, would it be ordinary that they would recant within 2 to 5 years or within 10 to 15 years? Actually, I think that that is extraordinary on itself, not extraordinary circumstances, but extraordinary that if, indeed, they had this guilt almost since day one, the fact that they didn't come forward earlier. So it's an extraordinary factor that doesn't necessarily include a beneficial result for the defendant. Correct. If anything, I'd say it's an extraordinary fact and it attacks the credibility of the witnesses that they didn't come forward. The fact that they claimed they couldn't find defendant, that's not believable. Defendant was in DOC. They could have gone to Lake County and said whether the prosecutor or the public defender and said, we want to recant. For all these reasons, we ask this Court to affirm. Thank you. Mr. Wysocki. Thank you, Justice. This is gossip very briefly. Extraordinary circumstances is fact specific to each case. Sui generis? I'm sorry. Sui generis? Yes. Aside from I think my opponent was arguing very vigorously and forcefully with speculative inferences as to why didn't these boys recant sooner. They did promptly. Well, once they started to feel safe and secure when they talked to their father, Mark Knauss, when they were still in middle school, preteens that he testified to. They were both part of the conversation. They both said, we lied, what Paul did at his trial. He didn't do this. Did they see Dr. Chantry at Mr. Canis' start or did Dr. Chantry come about during the post-conviction process? Mark Knauss didn't do anything with this. I can't argue that fact's not in the record, but he didn't do anything. He's an adopted father, and he didn't do anything. He just raised his children. Years later, at age 18, Jeremiah is accused of nonconsensual heterosexual contact with an underage female, 16 years of age, and he's charged with a felony. And his defense attorney, one of my major competitors in Lake County, the great prevaricator, was able to wear the state down. He ultimately got a misdemeanor. And they deferred him doing his sentence until he could finish his time at Indiana University, where these guys play basketball. And he goes back into the county jail, and they motion it up, and so Dr. Chantry comes down to interview him for the condition of his probation, misdemeanor probation, to do a sexual offender therapy if indicated from the evaluation. And that's what he says in 06. Just like this girl saying that I really raped her and I forced her is just like I said when I was a little boy that I lied about Paul because I wanted to get out of that faggot household. That's how these people evaluated their motivations. And the fact that they argued that Canals didn't do anything, what's he got to do with this? He's a civilian citizen. Here we got Jeremiah telling an employee, a psychologist of the Department of Court Services in the 19th Judicial Circuit about it. Why didn't she do something? Was Canals cross-examined about not telling anyone this when it was brought forth years and years before? Yeah. Reggie Matthews, the prosecutor, asked him, you didn't tell anybody about that, did you? You didn't do anything, did you? That's certainly something the court could consider credibility of Mr. Canals. Well, but it wasn't explored as to why he didn't do anything, whether he felt any obligation. It's certainly not an inference that it wasn't true because it wasn't that coupled with the fact that there was nothing in either victim's affidavit that they told Mr. Canals years earlier. Well, there was a lot of testimony in our hearing, Justice, that wasn't in either victim's affidavit either. That's not singularly significant as to the credibility of the occurrence of the recantation testimony in middle school. It's just a fact of coincidence. It's not demonstrative of did it occur, did it not occur, was it true, was it not true. Doesn't this go to recently fabricated, though, when supposedly for the first time something is raised that supposedly was allegedly raised previously some substantial time prior? Doesn't whenever you start talking about something that is stated that occurred in the past but was never mentioned in the past before, that it brings up the issue of a recently fabricated statement? Well, that was the State's argument at the hearing before Judge Levitt that this testimony is recently fabricated. Well, it's not a question of whether it's an argument. It's a question of whether it's a principle or a concept, a legal maxim or a legal principle that says that we are supposed to take that into consideration. That's one of the reasons why supposedly when something is allegedly recently fabricated, prior consistent statements are allowed to be brought in to establish that it isn't recently fabricated. That's correct. So to your benefit, you can say, well, since it's claimed that it was recently fabricated, my witnesses could testify or the defense witnesses could testify all they want about whether or not it transpired at an earlier time in order to determine the weight and credibility to assess as to whether or not it's recently fabricated. I don't disagree with that, Justice. The State, I don't want to argue outside the record, but you can always argue it's recently fabricated when it's recantation. This is nothing new. We've established that. You told a government employee, a Ph.D., that it wasn't true before there was any motivation to lie. And Canals, the father testified, they told him they were little boys. If anything, they had a motivation to keep their mouth shut because they feared naively that they might be put out of their father's home. Wasn't part of Jeremiah's statement to Dr. Chantry that Rashaan still says this happened? As far as he knew, Rashaan still says it happened. That's my understanding of that. I think your time is up. Thank you, Justices. Are there any other questions? Thank you. That'll be a short recess.